**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

WILLIE MACON,

Plaintiff,

vs. CASE NO.:

DEXTER'S ORIGINAL
BIRDLAND LLC
Florida Limited Liability Company
d/b/a JENNY'S EAT DRINK
SOCIALIZE

INJUNCTIVE RELIEF SOUGHT

Defendant(s).

# COMPLAINT

Plaintiff, WILLIE MACON (hereinafter "MACON"), by and through the undersigned counsel, hereby files this Complaint and sues DEXTER'S ORIGINAL BIRDLAND LLC, Florida Limited Liability Company, d/b/a JENNY'S EAT DRINK SOCIALIZE ("Defendant"), for declaratory and injunctive relief pursuant to 28 U.S.C. §§2201 and 2202, attorneys' fees, litigation expenses, costs (including, but not limited to, court costs and expert fees) for unlawful disability discrimination pursuant to Title III of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12181-12189 ("ADA"), and the regulations

implementing the ADA set forth in 28 C.F.R. Part 36, et seq, and alleges as follows:

1. This action arises from Defendant's failure to make Defendant's online platform located at www.jennysdowntown.com (hereinafter "Defendant's Website") compatible with screen access software, thereby denying blind individuals, including MACON, full and equal access to Defendant's products and services.

2. MACON files this lawsuit because Defendant's policies exclude him, and millions of other potential consumers, from fully and equally enjoying Defendant's products and services.

3. Accordingly, MACON seeks an order requiring that Defendant make Defendant's Website accessible and adopt sufficient policies and practices to ensure the Defendant's Website does not become inaccessible again in the future.

## JURISDICTION AND VENUE

4. This Court is vested with original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and to 28 U.S.C. §1343 for Plaintiff's claims arising under Title 42 U.S.C. §§ 12181-12189, based on Defendant's violations of Title III of the ADA. See also 28 U.S.C. §§ 2201, 2202, as well as the 2010 ADA Standards.

5. Venue is proper in this Court, Orlando Division, pursuant to 28 U.S.C. § 1391(b) and Internal Operating Procedures for the United States District Court of the Middle District of Florida in that a substantial part of the acts and omissions giving rise to MACON's claims occurred in Orange County, Florida.

6. Defendant attempts to and indeed does, participate in Orange County's economic life by offering and providing products and services over the internet to Orange County's residents, but also extends its services to other residents within the state of Florida through its online presence, including MACON, who is a resident of Orange County, Florida. Defendant purposefully avails itself of the benefits and advantages of operating an interactive, online business open 24-hours a day, 7-days a week, 365-days a year to Florida residents. Indeed, upon information and belief, Defendant places cookies on computers and other electronic devices physically located throughout Florida every time a Florida resident visits Defendant's Website.

7. Further, Defendant operates a Principal Place of Business with a physical address of 595 W Church St, Orlando, FL 32805 (hereinafter "Defendant's Principal Place of Business"), which is located in Orange County, Florida.

8. MACON was injured when he attempted to access Defendant's Website and encountered communication barriers that denied him full and equal

access to Defendant's online products, content, services, and other information that Defendant is interested in communicating/offering to its customers.

## PARTIES

9. MACON is a natural person over the age of 18 and is blind.

10. MACON is *sui juris* and is a resident of the State of Florida residing in Orlando, Florida, located in Orange County.

11. MACON is disabled as defined by the ADA and is therefore a member of a protected class under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 et seq. More specifically, MACON is legally blind from Traction Retinal Detachment, Neovascular Glaucoma, and other ocular complications caused by Diabetes Type I, and therefore is substantially limited in performing one or more major life activities, including but not limited to accurately visualizing his world. As a result of his visual impairment, MACON uses screen access software to access digital content, like text messages, emails, and websites.

12. MACON cannot use his computer without the assistance of appropriate and available auxiliary aids, screen reader software, and other technology and assistance. Screen reader software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a

webpage to the user. As explained in the Eastern District of New York holding of *Andrews v. Blick Art Materials, LLC*:

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be 'clicked,' which will bring him to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand. The screen reading software uses auditory -- rather than visual -- cues to relay this same information. When a sight impaired individual reaches a link that may be 'clicked on,' the software reads the link to the user, and after reading the text of the link says the word 'clickable.'...Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with his keyboard.

*Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y.2017).

13. MACON's blindness limits him in the performance of major life activities, including sight, and he requires assistive technologies, auxiliary aids, and services for effective communication, including communication in connection with his use of a computer.

14. MACON frequently accesses the internet. Due to blindness, to effectively communicate and comprehend information available on the internet and thereby access and comprehend websites, MACON uses commercially available screen reader software to interface with the various websites.

15. Defendant is a Florida Limited Liability Company with a principal place of business of 595 W Church St, Orlando, FL 32805 (hereinafter "Defendant's Principal Place of Business").

16. Defendant operates a restaurant and event venue under the name Jenny's Downtown Orlando. Defendant offers Southern-style food, brunch dishes, and beverages at its physical business. Defendant's Website provides consumers with the ability to review menu offerings, make dining reservations, and obtain catering and private-event information.

17. Defendant owns, operates, maintains, and/or controls Defendant's Website and is responsible for the policies, practices, and procedures concerning Defendant's Website development and maintenance.

18. Defendant's Principal Place of Business is also open to the public. As such, it is a Place of Public Accommodation subject to the requirements of Title III of the ADA and its implementing regulations as defined by 42 U.S.C. §12181(7)(B), §12182, and 28 C.F.R. §36.104(2). Defendant's Principal Place of Business is also referenced as a "place of public accommodation."

19. Defendant operates its restaurant and event venue at its physical location, through which it offers Southern-style food, brunch dishes, and beverages to the public. Defendant's Website serves as a digital extension of Defendant's physical business and provides consumers, including consumers within this

jurisdiction, access to information regarding the goods and services offered at Defendant's physical location. Through Defendant's Website, consumers can review menu offerings and brunch information, select dining and special-event reservation experiences, review holiday meal-pickup options, submit catering and private-event inquiries, view event information, sign up for the newsletter to receive exclusive offers and event invitations, and obtain contact information, hours, and directions. Defendant's Website is operated in connection with Defendant's physical business.

20. At all times material hereto, Defendant was and still is an organization owning, operating, and/or controlling Defendant's Website. Since Defendant's Website is open to the public through the internet, by this nexus Defendant's Website is an intangible service, privilege, and advantage of Defendant's Principal Place of Business that must comply with all requirements of the ADA, must not discriminate against individuals with visual disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages as are afforded the non-visually disabled public both online and in the Principal Place of Business. As such, Defendant has subjected itself and Defendant's Website to the requirements of the ADA.

## FACTUAL AND SUBSTANTIVE ALLEGATIONS

21. MACON is and has been a customer who is interested in patronizing and intends to patronize in the near future, once Defendant's Website's access barriers are removed or remedied, Defendant's Principal Place of Business.

22. During MACON's Website Visits, MACON attempted to use Defendant's Website to review the menu and select food and beverages for a visit to Defendant's physical restaurant, the same transactions and functions available to non-disabled customers through Defendant's Website. The menu was presented as an image without an accessible text equivalent, preventing MACON from independently reading the menu with his screen reader software. Defendant's failure to make these functions accessible to MACON's screen reader software denied MACON the same access to Defendant's goods that Defendant's Website provides to non-disabled customers.

23. Defendant's Website is additionally used to search for brick-and-mortar location, check Defendant's hours, pricing, offerings, and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at Defendant's Website or in Defendant's Principal Place of Business.

24. The opportunity to shop and pre-shop Defendant's offerings available for purchase at Defendant's Principal Place of Business and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at

Defendant's Principal Place of Business from his home are important accommodations for MACON because traveling outside of his home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating and confusing experience. These online functions directly affect MACON's in-store experience, such that they are tied to and provide a benefit to MACON. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using screen reader software.

25. Like many consumers, MACON accesses numerous websites at a time to compare offerings, prices, sales, discounts, events, and promotions. MACON may view several dozen websites to compare features, discounts, promotions, and prices.

26. MACON utilizes screen reader software that allows individuals who are visually disabled to communicate with websites. However, Defendant's Website contains access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

27. On or about the following dates, MACON attempted to utilize Defendant's Website:

a. August 10, 2026;

b. August 27, 2026;

c. September 13, 2026;

d. September 29, 2026;

e. October 17, 2026; and

f. October 18, 2026.

(hereinafter "MACON's Website Visits"). During MACON's Website Visits, MACON experienced substantial access barriers and, thus, was denied fair and equal access to same. MACON was attempting to browse the offerings and online offers to educate himself as to the offerings, sales, discounts, and promotions being offered, and with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

28. While notice to Defendant is not required, MACON sent a pre-suit communication on August 27, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

29. Prior to initiating suit, but following the sending of the pre-suit communications, MACON has continued to attempt to utilize Defendant's Website during MACON's Website Visits to browse and educate himself as to the offerings, sales, discounts, and online promotions, with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

30. However, Defendant's Website continues to contain access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

**VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT**

31. MACON adopts and re-alleges the allegations stated in paragraphs 1 through 30 above as if fully stated herein.

32. On July 26, 1990, Congress enacted the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. Commercial enterprises were provided one and a half (1.5) years from the enactment of the statute to implement its requirements. The effective date of Title III of the ADA was January 26, 1992, or January 26, 1993, if Defendant(s) have ten (10) or fewer employees and gross receipts of $500,000.00 or less. *See* 42 U.S.C. § 12182; 28 C.F.R. § 36.508(a).

33. Congress found, among other things, that:

a. some 43,000,000 Americans have one or more physical or mental disabilities, and this number shall increase as the population continues to grow older;

b. historically, society has tended to isolate and segregate individuals with disabilities and, despite some improvements, such forms of discrimination against disabled individuals continue to be a pervasive social problem, requiring serious attention;

c. discrimination against disabled individuals persists in such critical areas as employment, housing, public accommodations, transportation, communication, recreation, institutionalization, health services, voting and access to public services and public facilities;

d. individuals with disabilities continually suffer forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, benefits, or other opportunities; and,

e. the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our country is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and non-productivity.

42 U.S.C. § 12101(a)(1)-(3),(5) and (9).

34. Congress explicitly stated that the purpose of the ADA was to:

a. provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

b. provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; and

c. invoke the sweep of congressional authority, including the power to enforce the Fourteenth Amendment and to regulate commerce, in order to address the major areas of discrimination faced on a daily basis by people with disabilities.

42 U.S.C. § 12101(b)(1)(2) and (4).

35. Section 302(a) of Title III of the ADA, 42 U.S.C. § 12101 et seq., provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

36. "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the inability to choose.

. . . However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[1]

37. More than thirty years "after the passage of the ADA, numerous facilities are still not compliant, leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[2] and private individuals[3] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[4]

38. Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[5] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled."[6]

39. The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that because it "cannot investigate every place of public

---

[1] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (citing H.R. REP. No. 101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).

[2] 42 U.S.C. § 12188(b).

[3] 42 U.S.C. § 12188(a).

[4] Johnson, *supra* note 1.

[5] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).

[6] *Id.* (*quoting Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th Cir. 2008).

accommodation," "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[7]

40. Consistent with these policies, MACON files this case to ensure Defendant provides full and equal access to the goods and services that Defendant offers to the public from Defendant's Principal Place of Business and/or physical facilities.

41. Defendant's Principal Place of Business and Defendant's Website are public accommodations within the definition of Title III of the ADA, 42 U.S.C. § 12181(7).

42. There is a physical nexus between Defendant's Website and Defendant's Principal Place of Business in that Defendant's Website provides contact information, the physical address, and access to products and services found at Defendant's Principal Place of Business. Defendant's Website acts as the digital extension of Defendant's Principal Place of Business. The opportunity to research and pre-shop Defendant's Southern-style food, brunch dishes, and beverages available at Defendant's physical location, review menu offerings and brunch information, select dining and special-event reservation experiences, review holiday meal-pickup options, submit catering and private-event inquiries, view

[7] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

event information, sign up for the newsletter to receive exclusive offers and event invitations, and obtain contact information, hours, and directions through Defendant's Website from home are important accommodations for Plaintiff because traveling outside of his home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating, and confusing experience. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using screen reader software.

43. Public accommodations under the ADA must ensure that their places of public accommodation provide effective communication for all members of the general public, including individuals with visual disabilities such as Plaintiff.

44. The broad mandate of the ADA is to provide equal opportunity for individuals with disabilities to participate in and benefit from all aspects of American civic and economic life. That mandate extends to internet e-commerce websites such as the Defendant's Website.

45. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

46. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations, which is equal to the opportunities afforded to other individuals. 42 U.S.C. §12182(b)(1)(A)(ii).

47. Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things: “a failure to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage or accommodation being offered or would result in an undue burden.” 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii); see also 28 C.F.R. § 36.303(a).

48. According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include "voice, text, and video-based telecommunications products and systems". Indeed, 28 C.F.R. §36.303(b)(2) specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

49. Title III requires that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). The regulation sets forth numerous examples of "auxiliary aids and services," including "...accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision." 28 C.F.R. § 36.303(b). The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder. MACON, who is blind and has disabilities that substantially limit the major life activity of seeing within the meaning of 42 U.S.C. §§ 12102(1)(A) and (2)(A), has been denied full and equal access to Defendant's Website because of his disability. He has not been provided services that are provided to other patrons who are not disabled, and/or has been provided services that are inferior to the services provided to non-disabled persons. Defendant has failed to take the required prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

50. MACON encountered barriers on each of MACON's Website Visits. MACON attempted to access and/or utilize Defendant's Website, but was unable to, and he continues to be unable to enjoy full and equal access to Defendant's Website and/or understand the content therein because numerous portions of Defendant's Website do not interface with MACON's screen reader software. Specifically, features of Defendant's Website are inaccessible to MACON's screen reader software, including, but not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines and Conformance Levels):

a. **Hidden Focusable Links in the page**

i. **Issue:** The page contains links that are visually hidden yet remain accessible via keyboard navigation. When keyboard users press the Tab key, focus is directed to these hidden links despite their invisibility on screen. Screen reader users may hear these links announced without any visible indication of their location on the page. This creates a critical navigational conflict in which users can reach and interact with content that is neither visible nor available to sighted keyboard users.




ii. **WCAG 2.1 AA Violations:** 2.4.3 - A - Focus Order

iii. **Impact:** For users who are blind or have visual disabilities and rely on screen readers or keyboard-only navigation, hidden focusable links create a deeply disorienting and inaccessible experience. A blind user navigating via the Tab key may encounter links announced by their screen reader that correspond to no perceivable or interactive element on the page, making it impossible to determine context, purpose, or location within the interface. This inconsistency between what is announced and what is visually present undermines the user's ability to navigate confidently and independently. Hidden links should not receive keyboard focus when they are not visible or available for interaction. If a link is intentionally hidden, it must be removed from the keyboard navigation order until it becomes visible.

Keyboard focus should only advance to links and controls that users can perceive and interact with, ensuring a clear, consistent, and accessible navigation experience for all keyboard and screen reader users.

**b. Missing Skip to Main Content Link in the Page**

i. **Issue:** The page does not provide a skip navigation link that allows users to bypass repeated content and move directly to the main content area. Keyboard users are required to tab through all navigation links on every page load before reaching the primary content. Screen reader users must listen to all repeated navigational elements before accessing the main section of the page. This absence of a bypass mechanism significantly impedes efficient and independent navigation for users who rely solely on keyboard input or assistive technology.



ii. **WCAG 2.1 AA Violations:** 2.4.1 - A - Bypass Blocks

iii. **Impact:** For users who are blind and depend on screen readers, or for those who navigate exclusively by keyboard, the absence of a skip link creates a substantial and recurring barrier on every page visit. A blind user must endure the full announcement of all navigation links before reaching the meaningful content of the page, a process that is time-consuming, fatiguing, and entirely avoidable. This repetitive experience significantly degrades the usability of the page and denies blind users the same efficient access to content that sighted users take for granted. The page should include a visible skip link positioned at the top of the page that becomes visible upon receiving keyboard focus. This link should allow users to jump directly to the main content area, bypassing all repeated navigational elements. Implementing this mechanism ensures fast, efficient, and equitable navigation for keyboard and screen reader users alike.

**c. Missing List Markup for Social Media Links**

i. **Issue:** Social media links are presented visually as a grouped set of related items; however, they are not structured using appropriate list markup in the underlying code. As a result, screen reader users are unable to perceive the relationship between these links or understand that they form a cohesive group. The links may be announced as isolated, unrelated elements, depriving users of the structural context necessary for efficient and informed navigation.




ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind and rely on screen readers to interpret page structure, the absence of proper list markup for social media links results in a loss of meaningful context and navigational clarity. A blind user navigating the page will encounter these links without any indication that they

are related items belonging to a single group, making it impossible to understand the organizational structure of the content. This lack of programmatic structure forces blind users to interpret disconnected link announcements without the benefit of the grouping information that is visually apparent to sighted users. All grouped social media links must be marked up using appropriate semantic list elements such as `` and ``. This ensures that screen reader users are informed of the group's presence, the number of items it contains, and the relationship between those items. Correct HTML structure makes the content navigable, understandable, and accessible to all users of assistive technology.

**d. Missing New Window Indication for Social Media Links**

i. **Issue:** Social media links on the page open in a new browser window or tab; however, no visible text, accessible label, or programmatic indicator is provided to inform users of this behavior prior to activation. Screen reader users and keyboard users receive no warning that a new window will be launched when the link is activated. This absence of

advance notice makes it impossible for users to anticipate the navigational change, potentially causing disorientation and loss of context within their browsing session.




ii. **WCAG 2.1 AA Violations:** 2.4.4 - A, 3.2.2 - A - Link Purpose In Context

iii. **Impact:** For users who are blind and navigate using screen readers, the unexpected opening of a new browser window without prior warning is a significant and disorienting accessibility barrier. A blind user who activates a social media link without being informed that a new window will open may suddenly find themselves in an unfamiliar context with no clear understanding of what occurred or how to return to their previous location. This unpredictable behavior disrupts the user's mental model of the page, undermines their confidence in navigating independently,

and may cause them to lose their place entirely within the browsing session. All social media links that open in a new window must clearly communicate this behavior to users before the link is activated. This may be achieved by including visible text such as "(opens in a new window)" or by providing an equivalent accessible label readable by screen readers. Ensuring that this information is announced in advance allows blind users and all keyboard navigators to remain oriented, informed, and in control of their navigation experience.

**e. Non-Descriptive "Our Menu" Link Text**

i. **Issue:** The link text "Our Menu" lacks sufficient descriptive information to convey the link's purpose or destination to users navigating without visual context. Screen reader users who navigate by browsing a list of links on the page are unable to determine what product, service, or content the link relates to based on the link text alone. This ambiguity makes it impossible for users to make an informed decision about whether to activate the link, potentially causing them to skip relevant content or select an unintended action.




ii. **WCAG 2.1 AA Violations:** 2.4.4 - A - Link Purpose In Context

iii. **Impact:** For users who are blind and rely on screen readers to navigate page content, non-descriptive link text such as "Our Menu" presents a direct barrier to independent and informed navigation. Blind users frequently navigate pages by cycling through available links using their screen reader's link browsing mode, which presents link text in isolation without surrounding content. When link text fails to communicate the purpose or destination of the link, blind users are left without the information necessary to make a meaningful navigational choice, forcing them to either guess the link's function or bypass it entirely. Link text must clearly and specifically describe the action it performs and the destination or content it leads to, without requiring users

to seek additional context from surrounding page content. Including meaningful, descriptive words related to the specific product or service ensures that all users, particularly those relying on screen readers, can quickly understand and confidently select the appropriate link. Descriptive link text eliminates ambiguity, reduces navigational errors, and promotes an equitable and accessible browsing experience.

**f. Image used for text content**

i. **Issue:** The menu content is rendered as an image rather than real HTML text and accessible menu controls. When a user navigates to the menu, the screen reader announces the image as "Unlabeled Graphic" instead of conveying the menu content displayed within the image. Consequently, the user is unable to access or comprehend any of the available menu information, creating an insurmountable barrier for screen reader users, as the menu content is not provided in an accessible format.




ii. **WCAG 2.1 AA Violations:** 1.4.5 - AA, 1.1.1 - A - Images Of Text

iii. **Impact:** For users who are blind or have visual disabilities and rely on screen readers, the menu content is entirely inaccessible, as the screen reader announces only "Unlabeled Graphic" rather than the actual menu information. This means blind users are completely unable to identify, read, or interact with any menu item, effectively excluding them from accessing the core navigational and informational content of the page. The menu content must be provided as real HTML text, with each item announced by its correct name and purpose, and all interactive elements implemented as keyboard-operable links or buttons, so that screen reader and keyboard users can access

and understand the complete menu without dependence on the image.

g. **Missing Pause, Stop, Hide Control for Scrolling Marquee Text**

i. **Issue:** The scrolling text banner reading "More Than a Meal — It's Home." moves continuously across the screen without any button or control to pause, stop, or hide the motion. Users with cognitive or attention disabilities are unable to read the moving text at their own pace, and screen reader or keyboard users have no mechanism to halt the animation before it repeats, rendering the banner impossible to read or interact with for a significant portion of users.




ii. **WCAG 2.1 AA Violations:** 2.2.2 - A - Pause Stop Hide

iii. **Impact:** For users who are blind, have cognitive disabilities, or rely on keyboard navigation, the continuously moving banner "More Than a Meal — It's Home." presents a critical accessibility barrier. Blind users depending on screen readers may be unable to perceive or engage with the scrolling content in a meaningful way, while users with cognitive or attention disabilities cannot process moving text without the ability to pause it. The scrolling marquee must include a visible, keyboard-reachable control that allows users to pause, stop, or hide the moving text, with the content remaining stationary once paused until the user actively chooses to resume it.

**h. Missing Alt text for the image**

i. **Issue:** The image identified as "Jenny's Eat Drink Socialize" lacks alternative text. As a result, screen reader users hear no meaningful description, receiving only a generic announcement such as "image" or nothing at all, making it impossible for these users to determine what the image depicts or its relevance to the surrounding page content.




ii. **WCAG 2.1 AA Violations:** 1.1.1 - A - Non Text Content

iii. **Impact:** For users who are blind and rely on screen readers, the absence of alternative text on the "Jenny's Eat Drink Socialize" image means the content and purpose of that image are entirely inaccessible. Blind users receive no meaningful information, leaving them unable to understand what the image conveys or how it relates to the page. Every informative image must include an alt attribute containing a concise and accurate description of its content. If an image is purely decorative, the alt attribute should be set to empty (alt="") so that screen readers bypass it without confusion.

**i. Incorrect heading level defined for the "BARNEY LAHOMA" text**

i. **Issue:** The headings "BARNEY LAHOMA," "Tamara Jones," and "Daniel Ings" are not assigned the correct

heading levels in the page's underlying code, as they are marked as H4 instead of H2. Although these headings may appear visually correct, they are not structured properly within the document hierarchy. Screen reader users depend on accurate heading levels to understand the structure of a page and to navigate efficiently between sections. This improper heading structure creates an insurmountable barrier for users who rely on assistive technology, preventing them from navigating content quickly or understanding the relationship between page sections.




ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind and navigate pages using screen readers, incorrect heading levels severely disrupt the ability to understand page structure and move efficiently

between sections. When headings such as "BARNEY LAHOMA," "Tamara Jones," and "Daniel Ings" are coded as H4 instead of H2, blind users receive a misleading structural map of the page, making it difficult or impossible to locate content, understand section relationships, or navigate with purpose. All headings must be marked using proper semantic HTML heading tags in a correct and logical hierarchical order, without skipping levels, so that assistive technologies can accurately convey page structure and users can navigate with confidence.

**j. Incorrect heading level defined for the "ALL-YOU-CAN-EAT" text**

i. **Issue:** The heading "ALL-YOU-CAN-EAT" is not assigned the correct heading level in the page's underlying code, as it is marked as H4 instead of H3. Although it may appear visually correct, it is not structured properly within the document hierarchy. Screen reader users depend on accurate heading levels to understand the structure of a page and to navigate efficiently between sections. This improper heading structure creates an insurmountable barrier for

users who rely on assistive technology, preventing them from navigating content quickly or understanding the relationship between page sections.




ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind and navigate pages using screen readers, incorrect heading levels severely disrupt the ability to understand page structure and move efficiently between sections. When a heading such as "ALL-YOU-CAN-EAT" is coded as H4 instead of H3, blind users receive a misleading structural map of the page, making it difficult or impossible to locate content, understand section relationships, or navigate with purpose. All headings must be marked using proper semantic HTML heading tags in a correct and logical hierarchical order,

without skipping levels, so that assistive technologies can accurately convey page structure and users can navigate with confidence.

k. **Incorrect heading level defined for the "Welcome to Jenny's" text**

i. **Issue:** The "Welcome to Jenny's" headings are incorrectly marked as H4 elements instead of the appropriate H3 level. Although these headings may appear visually correct, their underlying code structure does not reflect the proper semantic hierarchy. Screen reader users rely on accurately structured headings to understand page organization and navigate efficiently between sections. This improper heading level assignment disrupts the logical flow of content, making it impossible for assistive technology users to accurately interpret the relationship between sections or move through the page with efficiency.




ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** Users who are blind or have visual disabilities and rely on screen readers are significantly affected by this incorrect heading structure. Because the "Welcome to Jenny's" headings are assigned as H4 instead of H3, the page's structural hierarchy is misrepresented to assistive technologies, preventing these users from accurately understanding content relationships. Screen reader users navigating by headings will encounter a disjointed and misleading structure, making it impossible to efficiently locate or contextualize content. All headings such as "Welcome to Jenny's" should be marked using proper semantic HTML heading tags in a correct hierarchical order, following a logical sequence without skipping levels

— for example, progressing from H1 to H2 rather than jumping directly to H4. A properly ordered heading structure enables assistive technologies to accurately convey page organization and allows users who are blind to navigate content independently and with confidence.

**l. Heading Level 1 Not Placed at Start of Main Content**

i. **Issue:** The H1 heading element is not positioned at the beginning of the main content area and instead appears after H2 and H3 headings have already been introduced. This inverted heading hierarchy undermines the logical structure of the page, as the primary topic is not established before subordinate sections are presented. Screen reader users navigating by heading levels will encounter lower-level headings before the page's main subject is identified, making it impossible to accurately understand the content hierarchy or determine the primary purpose of the page.




ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** Users who are blind and navigate web pages using screen readers are severely impacted by the misplacement of the H1 heading. Because the H1 element appears after H2 and H3 headings, screen reader users are introduced to subordinate content before the page's primary subject is ever announced, creating a fundamentally disorienting experience. This structural inversion makes it impossible for users relying on assistive technology to understand the page's purpose or navigate its content in a meaningful and logical sequence. The H1 should be the first heading within the main content area and must clearly describe the main topic of the page, with all subsequent headings such as H2 and H3 following in a logical hierarchical order. Ensuring

this correct heading sequence allows users who are blind to orient themselves immediately upon entering the page and navigate its structure without encountering impossible barriers.

51. Defendant's Website was subsequently visited by Plaintiff's expert, Till Paris, on or about August 14, 2026, and who confirmed the access barriers that MACON had initially encountered did, in fact, exist. The numerous access barriers found on Defendant's Website by Plaintiff's Expert are set forth in the Declaration of Till Paris, attached hereto as "Composite Exhibit 1". The contents of "Composite Exhibit 1" are incorporated herein by reference. These access barriers continue to render Defendant's Website inaccessible to users who are blind and visually disabled, including MACON.

52. More violations may be present on Defendant's Website, which can and will be determined and proven through the discovery process in this case.

53. There are readily available, well-established guidelines on the internet for making websites accessible to the blind and visually disabled. These guidelines have been followed by other large business entities in making their websites accessible. Incorporating such basic components to make the Defendant's Website accessible would neither fundamentally alter the nature of Defendant's business nor would it result in an undue burden to the Defendant.

54. Defendant thus has failed to make reasonable modifications in its policies, practices, or procedures when such modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, in violation of 28 C.F.R. §36.302.

55. To the best of Plaintiff's belief and knowledge, Defendant has failed to eliminate the specific violations set forth in paragraphs 50 and 51 herein. As a result, Defendant has violated the ADA -- and continues to violate the ADA -- by denying access to Defendant's Website by individuals, such as MACON, with visual disabilities who require the assistance of interface with screen reader software to comprehend and access internet websites. These violations within the Defendant's Website are ongoing.

56. Although Defendant is charged with having knowledge of the violations, Defendant may not have actual knowledge of said violations until this Complaint makes Defendant aware of same.

57. Here, however, MACON, through counsel, did send a pre-suit communication informing Defendant of the barriers to access on August 27, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

58. As a direct and proximate result of Defendant's failure to provide an ADA compliant Website, with a nexus to Defendant's Principal Place of Business,

Plaintiff has suffered an injury in fact by being denied full access to and enjoyment of Defendant's Website and Defendant's Principal Place of Business.

59. Because of the inadequate development and administration of the Defendant's Website, MACON is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303, to remedy the ongoing disability discrimination.

60. Enforcement of MACON's rights under the ADA is right and just pursuant to 28 U.S.C. §§2201 and 2202.

61. MACON has retained the undersigned counsel for the pursuit, filing and prosecution of this action. MACON is entitled to have his reasonable attorneys' fees, costs and expenses paid by Defendant, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505.

62. Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant MACON appropriate and necessary injunctive relief; including an order to:

a. Require Defendant to adopt and implement a web accessibility policy to make publicly available and directly link from the homepage of Defendant's Website to a statement as to the Defendant's policy to ensure persons with disabilities have full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations through Defendant's Website.

b. Require Defendant to take the necessary steps to make Defendant's Website readily accessible to and usable by visually disabled users, and during that time period prior to Defendant's Website's being readily accessible, to provide an alternative method for individuals with visual disabilities to access the information available on Defendant's Website until such time that the requisite modifications are made, and

c. Require Defendant to provide the appropriate auxiliary aids such that individuals with visual impairments will be able to effectively communicate with Defendant's Website for purposes of viewing and locating Defendant's Principal Place of Business, and becoming informed of and purchasing Defendant's offerings online, and during that time period prior to Defendant's Website's being designed to permit individuals with visual disabilities to effectively communicate, to provide an alternative method for individuals with visual disabilities to effectively communicate for such goods and services made available to the general public through Defendant's Website.

WHEREFORE, MACON requests entry of judgment in his favor and against Defendant for the following relief:

A. A declaration that Defendant's Website is in violation of the ADA;

B. An Order requiring Defendant, by a date certain, to update Defendant's Website, and continue to monitor and update Defendant's Website on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access, Defendant's Website and effectively communicate with Defendant's Website to the full extent required by Title III of the ADA;

C. An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within Defendant's Website, wherein the logo would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations. Such a clear display of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of Defendant's Website;

D. An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to ensure compliance thereto;

E. An Order directing Defendant, by a date certain, to evaluate its policies, practices and procedures toward persons with disabilities, for

such reasonable time to allow Defendant to undertake and complete corrective procedures to Defendant's Website;

F. An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for Defendant's Website to ensure effective communication for individuals who are visually disabled;

G. An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's Website to be fully accessible to the visually disabled;

H. An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish final content to, Defendant's Website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

I. An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of Defendant's Website to identify any instances where Defendant's Website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines,

and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review;

J. An Order directing Defendant, by a date certain, to make publicly available and directly link from Defendant's Website's homepage, a statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of Defendant's Website and shall accompany the public policy statement with an accessible means of submitting accessibility questions and problems;

K. An award to Plaintiff of his reasonable attorney's fees, costs, and expenses; and

L. Such other and further relief as the Court deems just and equitable.

## Certification Under Penalty of Perjury That Artificial Intelligence Was Used in the Preparation of This Filing

I have reviewed the Standing Order Requiring Disclosure of the use of artificial intelligence. Artificial intelligence was used in the preparation of this filing in the following way: The firm's case-management software uses AI to populate documents with case-specific information from the firm's records, creating a preliminary draft. Before filing, the signing attorney independently verifies that information against the underlying records, makes any necessary revisions, and reviews and finalizes the document. This automated population process does not perform legal research or generate case citations. The attorney then continues working on the document, reviewing all initial entries, and finalizing it before filing. The Case Management Software input does not involve legal research or case citations. However, under penalty of perjury, I certify that before filing, I personally reviewed Rule 11 of the Federal Rules of Civil Procedure and I personally read every case. I understand that if a case upon which I rely does not exist or does not reasonably stand for the cited proposition, the Court may treat this as a violation of Rule 11 of the Federal Rules of Civil Procedure. I have reviewed Rule 11 of the Federal Rules of Civil Procedure and I understand that this rule applies equally to counsel and unrepresented parties, that as the person signing this filing I am the person who will be held responsible for its

contents even if it was prepared by someone else, and I am familiar with the sanctions available for violations of Rule 11. If this certification is made by counsel, I further understand that citation to a case that either does not exist or does not reasonably stand for the cited proposition may be treated as a violation of my oath of candor toward the tribunal and a basis on which my admission to practice in the Middle District of Florida could be revoked or suspended. Further, whether I represent myself or I am an attorney representing a client, I understand that by making this certification under penalty of perjury, I could be referred for criminal prosecution if the statements I make here are false.

Dated: October 30, 2026

Respectfully submitted,

**ADA LEGAL TEAM, LLC**
300 Avenue of Champions, Suite 260
Palm Beach Gardens, FL 33418
Phone: (561) 227-9821
Facsimile: (561) 491-9459

By: **/s/ Gregory S. Sconzo**
GREGORY S. SCONZO, ESQUIRE
Florida Bar No.: 0105553
**DESIGNATED LEAD COUNSEL**
**Primary Email:** greg@sconzolawoffice.com
**Secondary Email**: greg@adalegalteam.com
**Secondary Email**: kevin@adalegalteam.com
**Attorney for Plaintiff**